IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
November 28, 2006 Session

**JASON LITTLE**

v.

**EASTGATE OF JACKSON, LLC**
D/B/A **EASTGATE DISCOUNT BEER & TOBACCO**

An Interlocutory Appeal from the Circuit Court for Madison County
No. C-06-79     Donald H. Allen, Judge

No. W2006-01846-COA-R9-CV - Filed April 24, 2007

This is a retaliatory discharge case. The plaintiff was an at-will employee of the defendant store. While at work, the plaintiff witnessed a woman across the street from the store being physically assaulted by an unidentified man. The plaintiff employee took a baseball bat from under the work counter, left the work premises, and yelled and gestured at the assailant with the bat, causing him to leave the scene. The plaintiff then brought the woman back to the store, where the police were called. Two days later, the defendant store terminated the plaintiff's employment because he had left the work premises to aid the assault victim. The plaintiff employee then sued the defendant, asserting that his termination violated Tennessee public policy. The defendant filed a motion to dismiss the complaint on its face, arguing that the termination did not violate a clearly established public policy of the State of Tennessee. The trial court denied the defendant's motion to dismiss, determining that the complaint stated a valid claim for retaliatory discharge. The defendant was granted permission to file this interlocutory appeal by the trial court and by this Court. We affirm, finding that the complaint states a claim for retaliatory discharge in violation of a clear public policy of the State of Tennessee.

**Tenn. R. App. P. 9 Appeal by Permission; Judgment of the Circuit Court is Affirmed and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which W. FRANK CRAWFORD, P.J., W.S., and DAVID R. FARMER, J., joined.

Dale Conder, Jr., and Spencer R. Barnes, Jackson, Tennessee, for the appellant, Eastgate of Jackson, LLC d/b/a Eastgate Discount Beer and Tobacco.

Justin S. Gilbert and Michael L. Russell, Jackson, Tennessee, for the appellee, Jason Little.

## OPINION

Plaintiff/Appellee Jason Little ("Little") was employed as a clerk at Defendant/Appellant Eastgate of Jackson, LLC d/b/a Eastgate Discount Beer and Tobacco ("Eastgate"), a store in Jackson, Tennessee. On September 10, 2005, while Little was working at the store, he saw a man across the street from the store physically assaulting a woman. Little took a baseball bat from under the store counter, left the store with the bat in hand, and gestured and yelled at the assailant, causing the assailant to leave the scene. Little then brought the woman to the store, where the police were called.

Two days later, on Monday, September 12, 2005, along with his paycheck, Eastgate presented Little with a separation notice terminating his employment. On the separation notice, Eastgate gave the following reason for the termination of Little's employment:

> [Little] took a baseball bat and left company property, while still on time clock and got involved in a fight across street from the store. This was none of our business, store cannot be put in this kind of liability situation.

On March 7, 2006, Little filed the instant lawsuit against Eastgate, alleging that he was wrongfully terminated in violation of the public policy of the State of Tennessee. On May 2, 2006, Eastgate filed an answer denying the allegations, and it also filed a motion to dismiss for failure to state a claim pursuant to Rule 12.02(6) of the Tennessee Rules of Civil Procedure. In the motion, Eastgate asserted that, at the time of his termination, Little was an at-will employee, that his termination was not in violation of any clearly established public policy of the State of Tennessee, and that he was not terminated for attempting to exercise a statutory or constitutional right. On June 5, 2006, Little filed his own affidavit, attesting to the events that took place.

On June 6, 2006, the trial court held a hearing on Eastgate's motion to dismiss. The appellate record does not include a transcript of that hearing. On June 13, 2006, the trial court entered an order denying Eastgate's motion to dismiss, holding that the complaint stated a valid claim for relief. The trial court reasoned that "it is against the public policy of the state of Tennessee, most particularly evidenced by Tenn. Code Ann. [§] 39-11-612 ("Defense of Third Person"), to discharge an employee for coming to the aid of a third party being assaulted or in imminent danger of bodily harm." Eastgate filed a motion for permission to file an interlocutory appeal from the trial court's decision, and Little did not object. Permission for Eastgate's interlocutory appeal was granted by both the trial court and by this Court.

On appeal, Eastgate argues again that terminating Little's employment did not violate a clearly established public policy of the State of Tennessee and that, consequently, Little's complaint must be dismissed. In reviewing the trial court's decision on a motion to dismiss, we must take all allegations in the complaint as true; we do not evaluate the strength of the evidence. *Doe v. Sundquist*, 2 S.W.3d 919, 922 (Tenn. 1999); *Mayhew v. Wilder*, 46 S.W. 760, 781 n.4 (Tenn. Ct. App. 2001). The motion must be denied unless it appears that the plaintiff can prove no set of facts that would support a claim for relief. *Sundquist*, 2 S.W.3d at 922. The trial court's legal

conclusions drawn from the facts as alleged in the complaint are reviewed *de novo*, with no presumption of correctness. *Id.* Here, the facts as alleged in Little's complaint are undisputed. The parties agree that the issue of whether Little's termination violates a clear public policy of the State of Tennessee is an issue of first impression in Tennessee.

Tennessee has long adhered to the employment-at-will doctrine, under which either an at-will employee or his employer are generally permitted, with certain exceptions, to terminate the employment relationship "at any time for good cause, bad cause, or no cause." *See Crews v. Buckman Labs. Int'l, Inc.*, 78 S.W.3d 852, 857 (Tenn. 2002) (quoting *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 574 (Tenn. 1999)). As an exception to the employment-at-will doctrine, the Tennessee Supreme Court has recognized that "[a]n employer's ability to discharge at-will employees [is] significantly tempered by our recognition . . . of a cause of action for retaliatory discharge." *Id.* at 858 (citing *Clanton v. Cain-Sloan*, 677 S.W.2d 441 (Tenn. 1984)). The Court has "further recognized that an at-will employee 'generally may not be discharged for attempting to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy which is evidenced by an unambiguous constitutional, statutory, or regulatory provision.' " *Id.* (quoting *Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 716-17 (Tenn. 1997)).

The retaliatory discharge exception to the employment-at-will doctrine should be "narrowly applied," and cannot be permitted to consume or eliminate the general rule. *Harney v. Meadowbrook Nursing Center*, 784 S.W.2d 921, 923 (Tenn. 1990) (quoting *Whittaker v. Care-More, Inc.*, 621 S.W.2d 395, 397 (Tenn. Ct. App. 1981)). Nevertheless, we recognize "that, in limited circumstances, certain well-defined, unambiguous principles of public policy confer upon employees implicit rights which must not be circumscribed or chilled by the potential of termination." *Crews*, 78 S.W.3d at 858 (quoting *Stein*, 945 S.W.2d at 716-17). The four elements of a claim of retaliatory discharge are: (1) an employment-at-will relationship existed; (2) the employee was discharged; (3) the reason for the discharge was that the employee attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and (4) a substantial factor in the employer's decision to discharge the employee was the employee's exercise of protected rights or compliance with clear public policy. *Id.* at 862. Determining what constitutes a clear public policy is a question of law, reviewed *de novo* with no presumption of correctness.

In this case, we focus on the third element of Little's retaliatory discharge claim, that is, whether Little was discharged for attempting to comply with a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision.[1] The trial court held that terminating Little based on his actions violated the public policy of the State of Tennessee as evidenced in the Tennessee Criminal Code, section 39-11-612, regarding the justification for using force in defense of a third person. This statute provides:

---

[1] Little does not allege that he was attempting to exercise a statutory or constitutional right; rather, the complaint avers solely that his termination violated clearly established public policy in Tennessee "which encourages heroic conduct of giving aid to a person in a potentially life threatening situation."

A person is justified in threatening or using force against another to protect a third person if:

(1) Under the circumstances as the person reasonably believes them to be, the person would be justified under § 39-11-611 [regarding self defense] in threatening or using force to protect against the use or attempted use of unlawful force reasonably believed to be threatening the third person sought to be protected; and

(2) The person reasonably believes that the intervention is immediately necessary to protect the third person.

T.C.A. § 39-11-612 (2003).

Eastgate argues that the trial court erred in denying its motion to dismiss. Eastgate notes that courts in Tennessee traditionally are reluctant to intrude on the employment-at-will doctrine, and maintains that terminating Little did not constitute a violation of a clearly established public policy of Tennessee when, under the circumstances of this case, Little's actions unnecessarily exposed Eastgate to liability. Eastgate argues that the trial court's recognition of a new public policy stemmed from an overexpansive interpretation of a criminal defense statute, in contradiction to well-established precedent. It points out that Tennessee courts have stressed their limited role in articulating public policy in retaliatory discharge cases, refusing to engage in the "legislative function" of establishing public policy. The exception recognized by the trial court, Eastgate argues, would consume the general employment-at-will doctrine, and would unduly limit employers' ability to make reasonable business decisions. In response, Little argues that Tennessee Code Annotated § 39-11-612 reflects an important public policy of encouraging the rescue of a third party from imminent bodily harm, and that the purpose of a retaliatory discharge claim is to "encourage the employee to protect the *public interest*." **Crews**, 78 S.W.3d at 860 (emphasis added). He argues that his claim springs from the ultimate public interests – the sanctity and integrity of human life, the prevention of crime, and the safety of the public. Little asserts that criminal statutes, such as the one at issue, constitute the voice of the legislature and are a valid source from which to find public policy. Thus, Little argues, his complaint stated a valid claim for retaliatory discharge.

The parties agree that there are no decisions from the appellate courts of this State addressing the viability of a claim of retaliatory discharge under these circumstances. Tennessee courts have, however, addressed retaliatory discharge claims presented in different contexts.

Both parties cite the Tennessee Supreme Court's decision in **Crews v. Buckman Labs. Int'l, supra**, as providing the appropriate framework for determining whether the public policy exception applies in this case. In **Crews**, the plaintiff lawyer was in-house counsel for the defendant corporation. The defendant's general counsel was not licensed to practice law in Tennessee, though she held herself out to be a lawyer. The plaintiff reported to work officials and to the Tennessee Board of Law Examiners that the general counsel was engaging in the unauthorized practice of law. The plaintiff's employment was later terminated. She then filed a lawsuit alleging that her employment was terminated in retaliation for lodging the reports against the general counsel. The plaintiff averred that the Tennessee Code of Professional Responsibility imposed upon lawyers the

-4-

ethical duty not to aid non-lawyers in the unauthorized practice of law, and that she was impermissibly terminated for complying with this duty. *Crews*, 78 S.W.3d at 864; *see* Tenn. Sup. Ct. R. 8, DR 3-101(A) (similar to duty imposed in Tenn. Sup. Ct. R. 8, RPC 5.5, effective March 1, 2003). The trial court dismissed her complaint on its face, and the intermediate appellate court upheld the dismissal. The Supreme Court reversed and held that the plaintiff's complaint stated a valid claim for relief.

The Court in *Crews* recognized that "many of the duties imposed upon lawyers by the Tennessee Code of Professional Responsibility represent a clear and definitive statement of public policy." *Id.* at 864. The ethical duty not to aid in the unauthorized practice of law, the Court reasoned, reflected an important public policy, because the purpose of the regulation was to protect the public from those who were unlearned and unskilled in the law. The Court acknowledged that the plaintiff was not *required* to report her superior's unauthorized practice of law under the ethical rule; her duty was only permissive. Nevertheless, the Court concluded that terminating the plaintiff for reporting the conduct of the general counsel violated a clear public policy in Tennessee as evidenced in the Code of Professional Responsibility. *Id.* at 865; *see Watson v. Cleveland Chair Co.*, 789 S.W.2d 538, 540 (Tenn. 1989) (recognizing a claim of retaliatory discharge when employee was terminated for refusing to participate or remaining silent about illegal activities); *Clanton v. Cain Sloan Co.*, 677 S.W.2d 441, 444-45 (Tenn. 1984) (recognizing a claim of retaliatory discharge when the employee was terminated for exercising her rights under the worker's compensation statutes).

Little emphasizes that, according to the *Crews* Court, the employment-at-will doctrine is "significantly tempered" by the public policy exception, as is evidenced by the Court's conclusion in that case. Thus, Little urges a broad reading of the holding in that case and argues that the public interest asserted in this case, encouraging citizens to attempt to protect others from imminent death or bodily harm, is at least as important as the public interest found in *Crews*, protecting individuals from those who are unskilled in the law. In contrast, Eastgate urges a narrow reading of *Crews*, arguing that the decision demonstrates that the public policy exception is to be applied only in "limited circumstances" when "well-defined" principles of public policy are violated. *See Crews*, 78 S.W.3d at 858.

Eastgate also cites *Sloan v. Tri-County Electric Membership Corp.*, No. M2000-01794-COA-R3-CV, 2002 WL 192571 (Tenn. Ct. App. Feb. 7, 2002), in support of its position. In *Sloan*, the plaintiff filed a lawsuit against her former employer for retaliatory discharge, alleging that her employment was terminated because she married a co-worker in violation of the company's anti-nepotism policy. The plaintiff argued that marriage is a fundamental right that is favored by the public policy of Tennessee, and that termination of her employment violated the clear public policy favoring marriage. The appellate court noted that Tennessee had no statute regulating a private employer's decisions regarding whether to employ persons who are married to each other, and that Tennessee did not prohibit employment discrimination on the basis of "marital status." *Sloan*, 2002 WL 192571, at *5. Based on the lack of any such legislation, the appellate court concluded that the defendant company's policy prohibiting concurrent employment of spouses did not contravene the

-5-

State's public policy favoring marriage. *Id.* at \*6. Eastgate argues that this case shows that the Tennessee courts will intrude on the employment-at-will doctrine only under very limited circumstances. *See also Harney v. Meadowbrook Nursing Center*, 784 S.W.2d 921, 923 (Tenn. 1990) (refusing to recognize a claim of retaliatory discharge when the employee was discharged in retaliation for testifying against the employer at a co-employee's unemployment compensation hearing); *Rigsby v. Murray Ohio Mfg. Co.*, No. 01-A-019012CV00457, 1991 WL 95710, at \*2 (Tenn. Ct. App. June 7, 1991) (refusing to recognize a claim of retaliatory discharge when employee was discharged for exercising his right to free speech on his employer's premises).

The only case cited by the parties which is factually similar to the instant case was decided by the Washington Supreme Court, *Gardner v. Loomis Armored*, 913 P.2d 377 (Wash. 1996) (*en banc*). In *Gardner*, the plaintiff employee drove an armored car for the defendant armored car company. While at a scheduled stop at a bank, the plaintiff witnessed an assailant chasing a screaming female bank employee out of the bank with a knife. Seeing no one coming to help the bank employee, the plaintiff left his armored car. Eventually, he and his fellow employee tackled the suspect and disarmed him. *Gardner*, 913 P.2d at 378-79. The armored car company later terminated the plaintiff's employment because he exited the armored truck, which was a violation of an express company policy, set out in the company handbook, "forbidding armored truck drivers from leaving the car unattended." *Id.* at 379. The plaintiff later filed a lawsuit against the defendant armored car company in federal district court. The district court certified the following question to the Washington Supreme Court: "Does it violate public policy in the State of Washington to discharge an at-will employee for violating a company rule in order to go to the assistance of a citizen held hostage at the scene of a crime, and/or who is in danger of serious physical injury and/or death?" *Id.* In an eight to one *en banc* decision, the Washington Supreme Court answered in the affirmative.

In determining whether to recognize an exception to the at-will rule under these circumstances, the *Gardner* court structured its analysis by looking at the following four elements: (1) whether the plaintiff has proven the existence of a clear public policy; (2) whether discouraging the conduct in which the plaintiff engaged would jeopardize the public policy; (3) whether the "public-policy-linked conduct" in fact caused the dismissal; and (4) whether the defendant employer has an "overriding justification" for the termination of the plaintiff's employment. *Id.* at 382 (citing Henry H. Perritt, Jr., *Workplace Torts: Right and Liabilities* § 3.7 (1991)). The court looked first at whether the situation implicated clear public policy in the State of Washington:

> Society places the highest priority on the protection of human life. This fundamental public policy is clearly evidenced by countless statutes and judicial decisions.
>
> The value placed on human life is demonstrated by the fact that courts have even suspended certain fundamental constitutional rights when a citizen's life is in imminent danger. For example, the Fourth Amendment's protection against warrantless searches is waived under limited exigent circumstances, including

-6-

situations where the search is necessary to prevent physical harm to the officers or other persons.

> Besides subordinating some constitutional rights, ***the public policy favoring the protection of human life also serves as a defense against most criminal charges. What would otherwise be the illegal use of force becomes lawful when it is done to protect oneself or others from injury.*** Homicide is justifiable if committed in the lawful defense of oneself or others. Furthermore, in a prosecution for any crime other than homicide, it is a complete defense that the actor participated in the crime under compulsion by another who by threat or use of force created an apprehension in the mind of the actor that in case of refusal he or another would be liable to immediate death or immediate grievous bodily injury. These statutes show society would rather have one commit a crime under duress than refuse compliance and risk the life of whoever is threatened. Society benefits by a citizen's death being prevented, to the extent that some constitutional rights and criminal laws are suspended when one acts to save another's life. This public policy of saving persons from life threatening situations satisfies the clarity element.

*Id.* at 383-84 (emphasis added; citations & quotations omitted). Thus, the court in ***Gardner*** determined that the policy of protecting human life was clearly reflected in the constitution and in several statutes, in that the protection of human life subordinates some constitutional rights and serves as a defense against most criminal charges.

The ***Gardner*** court also examined whether permitting an employer to discharge an employee under these circumstances would jeopardize the public policy. The court noted that, to establish such jeopardy, the plaintiff employee must show that his conduct "*directly relates* to the public policy or [is] *necessary* for the effective enforcement of the public policy . . ." and that "the threat of dismissal will discourage others from engaging in the desirable conduct." *Id.* at 384 (citing Perritt § 3.14 at 75-76) (emphasis in original).

In that case, the ***Gardner*** court found that the plaintiff employee "unquestionably rescued the hostage from imminent life threatening harm." *Id.* Because the plaintiff recognized the female as a bank employee and looked around and saw no one else coming to her aid, the court determined that he could have reasonably believed that the assailant was not engaged in a ploy to get him to leave his armored vehicle and that there was a genuine threat to the bank employee's life. *Id.* The court found:

> Gardner's being fired for those actions will discourage similar future conduct in other employees. If employers are allowed to terminate their employees for saving persons from life threatening situations when the employee appears to be the only hope of rescue, then the policy encouraging all citizens to engage in such conduct would be jeopardized.

*Id.* at 385.

In *Gardner*, the defendant armored car company argued that the causation element was not satisfied because the plaintiff was not fired for rescuing the bank employee; rather, he was fired for leaving the armored vehicle. The *Gardner* court rejected this reasoning and found that the causation element was satisfied. *Id.*

Finally, the court in *Gardner* considered whether the defendant employer had a defense, namely, an overriding justification for terminating the plaintiff's employment "despite the employee's public-policy-linked conduct." *Id.* at 385-86. The court noted that this element "acknowledges that some public policies, even if clearly mandated, are not strong enough to warrant interfering with employers' personnel management." *Id.* at 385. The court conceded that the defendant armored car company put forth compelling justification for strict enforcement of its rule prohibiting drivers from leaving their trucks. The *Gardner* court outlined the employer's argument:

> The rule is allegedly necessary to protect the safety and lives of [the defendant's] employees. The drivers are safe inside the compartments and they can use the available two-way radio, public address system, and sirens to summon help. A driver's exiting the truck severs the partner's lifeline to safety and renders both employees more vulnerable to harm. . . . Defendant cited [an] incident where an armored car driver got out of the truck in response to his partner being robbed. Upon exiting the truck the driver was shot six times and killed.
>
> A more specific reason for strictly enforcing the work rule involves the risk of robbers using a ploy to get the driver out of the truck. . . . If robbers knew they could trick drivers out of the truck every time it appeared someone was in need of help, the occurrence of such ploys could increase. . . .

*Id.* Thus, the *Gardner* court stated, it was required to balance the public policies proffered by the plaintiff employee against the defendant employer's "legitimate interest in maintaining a safe workplace and determine whether those public policies outweigh [the employer's] concerns." *Id.* at 386.

The *Gardner* court declined to adopt a "broad good Samaritan doctrine" advocated by the plaintiff employee, noting that the employer's interests could not be "subjugated to a plethora of employee excuses," such as justifying tardiness or missed delivery deadlines because the employee stopped to assist a motorist with car trouble. Rather, the *Gardner* court emphasized that its ruling would apply only under a narrow set of circumstances:

> The narrow public policy encouraging citizens to rescue persons from life threatening situations clearly evinces a fundamental societal interest of greater importance than the good samaritan doctrine. The value attached to such acts of heroism is plainly demonstrated by the fact that society has waived most criminal and tort penalties

stemming from conduct necessarily committed in the course of saving a life. If our society has placed the rescue of a life above constitutional rights and above the criminal code, then such conduct clearly rises above a company's work rule.

*Id.* The *Gardner* court found that the armored car company's work rule was not an overriding justification for firing the plaintiff employee when his conduct directly furthered the public policy encouraging citizens to save others from serious bodily injury or death. *Id.*

Therefore, while recognizing the importance of the employer's legitimate work rule forbidding drivers from leaving the armored vehicles, the *Gardner* court held that the employer was prohibited from firing the employee "when he broke the rule because he saw a woman who faced imminent life-threatening harm, and he reasonably believed his intervention was necessary to save her life." *Id.* In a separate concurring opinion, one Washington justice emphasized that the exception to the at-will employment doctrine was to be applied only in the narrow instance in which another's life was in danger, commenting, "It defies what I believe is true about human nature that anyone would be willing to watch a person die in order to comply with a company safety rule. I believe our nature would cause any decent person, under these dire circumstances, to break the rule and save the life." *Id.* at 386-87 (Guy, J., concurring).

We find the reasoning in *Gardner* to be persuasive. Like most states, both Tennessee and Washington adhere to the employment-at-will doctrine and nevertheless recognize an exception to the at-will doctrine for the discharge of an employee for reasons that contravene public policy. *See id.* at 379 (noting that "[a]lmost every state has recognized this public policy exception"). Like Tennessee, Washington courts caution that "the exception should be narrowly construed in order to guard against frivolous lawsuits." *Id.* at 380 (citing *Thompson v. St. Regis Paper Co.*, 685 P.2d 1081 (Wash. 1984)). Tennessee caselaw such as *Sloan v. Tri-County Electric*, *supra*, cautions against courts pronouncing public policy where the legislature has declined to do so. However, where public policy has been made manifest by statute or other legislative pronouncement, we must recognize and honor it. This is no less true where, as in *Crews*, the conduct being encouraged and protected is not mandatory, but permissive. *Crews*, 78 S.W.3d at 865.

Here, Tennessee's public policy of placing a high priority on the sanctity of human life is clearly evinced in its statutes. Conduct which otherwise would be prohibited is encouraged and protected when undertaken to rescue another in mortal danger. Legislative immunity is granted for such heroic actions in statutes such as Tennessee Code Annotated § 39-11-612, which absolves citizens from criminal liability for using force to rescue or protect a third person when the citizen "reasonably believes that the intervention is immediately necessary to protect the third person." T.C.A. § 39-11-612 (2003); *see also* § 39-11-504 (2003) (duress); § 39-11-621 (2003) (use of deadly force by a private citizen); § 39-17-1322 (2003) (defenses to prosecution for an offense against public health, safety, and welfare). These statutes evidence the unambiguous legislative intent to pronounce the Tennessee public policy of encouraging citizens to rescue a person reasonably believed to be in imminent danger of death or serious bodily harm, and to protect a citizen who undertakes such heroic action from negative repercussions.

-9-

As in *Gardner*, we decline to adopt a broad "Good Samaritan" doctrine protecting all conduct undertaken in aid of another. Rather, the public policy demonstrated in the statute extends only to situations in which the employee took action to rescue or protect another reasonably believed to be in imminent danger of death or serious bodily harm. Such a narrow public policy exception is unlikely to consume or eliminate the general rule favoring the employment-at-will doctrine. *See Harney*, 784 S.W.2d at 923.

Taking the allegations in Little's complaint as true, Little left Eastgate's premises in order to save another whom he reasonably believed was in such imminent danger of death or serious bodily harm. This implicates Tennessee's public policy of encouraging such actions and protecting those who undertake them.

We are also convinced of the wisdom of adopting the analytical framework adopted by the *Gardner* court for applying such a public policy exception, as helping to ensure that the exception is narrowly applied and recognizing an employer's legitimate need for latitude in making personal decisions. As noted above, this framework requires the employee to prove (1) that the clear public policy exists, (2) that discouraging the conduct in which the plaintiff engaged would jeopardize the public policy, and (3) that the "public-policy-linked conduct" in fact caused the dismissal. *Gardner*, 913 P.2d at 382. The *Gardner* court recognized that, despite the importance of the public policy, the employer may nevertheless have a compelling reason for discharging the employee.[2] Therefore, as part of the analysis, the employer is permitted to assert the defense of an "overriding justification" for termination of the plaintiff's employment.

Applying this analysis in this case, on remand, Little must prove that discouraging the conduct in which he engaged would jeopardize the public policy, i.e., that firing an employee for leaving the work premises in order to rescue someone in immediate danger of death or serious bodily harm, would discourage others from taking action to save another. Little must also prove that "the public-policy-linked conduct caused [his] dismissal. . . ." *See Gardner*, 913 P.2d at 382. Eastgate's asserted concerns that Little's actions could expose Eastgate to potential liability would be considered a defense, a claimed "overriding justification" for terminating Little's employment.

In sum, we agree with the trial court's recognition of a clearly-mandated public policy in favor of encouraging citizens to rescue others reasonably believed to be in imminent danger of death or serious bodily harm, and find that this public policy may be the basis for an exception to the at-will employment doctrine in Tennessee. We also find that the complaint in this case states a claim as to the other elements, namely, whether discouraging the employee's conduct would jeopardize this public policy, and whether the employee's protected conduct caused the dismissal. The employer may assert applicable defenses, such as whether it had an overriding justification for discharging the employee. We believe this to be a narrow exception to the at-will doctrine, which

---

[2]Indeed, in *Gardner*, as important as is the public policy recognized, the court acknowledged the compelling nature of the employer's justification for enforcing its policy of requiring its armored vehicle drivers to stay inside the vehicle. *Gardner*, 913 P.2d at 385.

will not overly burden an employer's ability to enforce work rules and make personnel decisions. Accordingly, we affirm the trial court's decision to deny Eastgate's motion to dismiss.

The decision of the trial court is affirmed, and the cause is remanded for further proceedings not inconsistent with this Opinion. Costs on appeal are to be taxed to Appellant Eastgate of Jackson, LLC, d/b/a Eastgate Discount Beer & Tobacco, and its surety, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE